UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

I.S., by his Parents and Next Friends,    )
RICHARD and CHRISTINA SEPIOL              )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )    Case No. 2:11-CV-160 JD
                                          )
SCHOOL TOWN OF MUNSTER, *et al.*,         )
                                          )
          Defendants.                     )

## AMENDED OPINION AND ORDER

This is an action under the Individuals with Disabilities in Education Act. Richard and

Christina Sepiol contend that the School Town of Munster and the West Lake Special Education

Cooperative (collectively "the School") failed to provide their son, referred to in this matter as

I.S., with a free appropriate public education. The independent hearing officer agreed with them

in part, finding that the School failed as to one of the school years in question, but she awarded

little in the way of compensation. On appeal, the Parents argue that the School actually denied

I.S. an appropriate education for four years, and they seek relief in the form of reimbursement for

I.S.'s attendance at a private school.

Both parties have moved for summary judgment, which is the procedural vehicle through

which these administrative review actions are resolved, and the motions are ripe for ruling. For

the following reasons, the Court grants both motions in part and denies both motions in part. The

Court finds that the School denied I.S. a free appropriate public education for parts of two school

years, and remands this matter to the Indiana Department of Education to determine the

appropriate amount of compensation.

# I. FACTUAL BACKGROUND

I.S. is a student with a severe form of dyslexia. Although he has average intelligence, he has significant impairments in the areas of decoding (sounding out words phonetically) and encoding (spelling and writing) language. (R. 162). He began attending Hammond Elementary School in the School Town of Munster in kindergarten in the fall of 2005, and he received supplemental assistance during that year and also received tutoring over the summer. When he entered the 1st grade in August 2006, his parents became concerned about his continuing difficulties with reading and phonics, so they requested that the School evaluate him for a possible learning disability. (R. 695). The School completed an evaluation in October 2006, which indicated that I.S. had a learning disability in the areas of reading, math, and written expression. (R. 727, 188). The School therefore held a Case Conference Committee[1] ("CCC") meeting on November 21, 2006 to develop an Individualized Educational Program ("IEP") setting forth the special education services that I.S. would receive. The IEP provided that I.S. would primarily remain in his general education classroom, but that he would receive 45 minutes of direct reading instruction each day in a resource room, and that he would receive 1 hour of instructional support each day in his classroom. (R. 207). The School implemented this IEP for the rest of I.S.'s 1st grade year and into his 2nd grade.

The CCC met again the following year on November 5, 2007, in the fall of I.S.'s 2nd grade year. At that time, I.S. was receiving reading instruction primarily through the "Fundations" program, which teaches phonics, phonemic awareness, and spelling through Orton-Gillingham-based methodology. The IEP that the School developed for this year called for I.S. to receive one hour of direct reading instruction each day in a resource room, in addition to one

---

[1] The Case Conference Committee includes various school officials and a student's parents, and is tasked with preparing a student's annual Individualized Educational Programs.

hour each day of instructional support. (R. 225). The IEP also contained goals for the areas of reading, writing, and math. For example, I.S.'s reading goal was that "[I.S.] will continue to use decoding skills to sound out words with a variety of letter patterns and sounds in 7/10 attempts while reading orally. [I.S.] will also continue to improve his sight word vocabulary using the Dolch word cards." (R. 216). This goal was accompanied by a number of related sub-goals.

The next CCC meeting occurred the following year on December 18, 2008, during I.S.'s 3rd grade year. (R. 232). The Parents were unable to attend this meeting, so the School prepared the new IEP and sent it to the Parents for their review, apparently without any response or objection. The IEP again called for I.S. to receive 1 hour of direct reading instruction and 1 hour of instructional support each day, though I.S.'s teacher testified that he actually received about an hour and fifteen minutes of direct instruction each day. I.S.'s reading goal remained almost identical,[2] though the IEP set new goals for writing and math. During this school year, I.S. received reading instruction primarily through the Wilson Reading Program, which is similar to the Fundations program but for older students, and which is also based on Orton-Gillingham principles.

Near the beginning of I.S.'s 4th grade year, the School began implementing its direct reading instruction through a program called Read 180. Read 180 is an alternate core curriculum that focuses heavily on fluency and comprehension but provides little instruction in phonics or phonemic awareness, and the use of this methodology is one of the primary points of contention in this matter. The Read 180 program takes 90 minutes daily, consisting of an initial whole-group instructional session, followed by rotations of 15 to 20 minutes each through small-group

---

[2] "[I.S.] will demonstrate the ability to use decoding skills to sound out words with a variety of letter patterns and sounds in 7/10 attempts while reading orally." (R. 233). Four of the seven sub-goals from the 2nd grade IEP remained in the 3rd grade IEP as well, and no new sub-goals were added.

instruction, independent reading, and individual work on a computer program, and concluding with a whole-group wrap-up session. (R. 1830–34, 2644–46). The School had not used this program before, so I.S.'s teacher was still receiving training in this program throughout the year, and did not learn some aspects of the program until the end of the year.

The School next reviewed the IEP on November 6, 2009, in the fall of I.S.'s 4th grade year, after it had begun implementing Read 180. The Parents were again unable to attend the CCC meeting, so the School prepared the IEP and sent it to the Parents for their review. Because Read 180 required 90 minutes daily, I.S.'s 4th grade IEP was updated to include 90 minutes of direct reading instruction each day, while he continued to receive 1 hour of instructional support. (R. 253). However, all of the goals in this IEP were identical to the goals in the 3rd grade IEP, and all of the sub-goals remained the same as well, with only a single exception. (R. 249–51).

Although the Parents apparently did not respond to the IEP initially, I.S.'s mother wrote to the School on April 5, 2010, to request an immediate meeting, as she began to grow concerned that I.S. was not making appropriate progress. (R. 578). The School convened a CCC meeting on April 14, 2010. (R. 270). At the meeting, I.S.'s mother expressed her concern with the Read 180 program, particularly with the independent reading and the computer program portions of the instruction, as I.S. struggled with working independently on his reading. Accordingly, the School agreed to suspend these independent portions of the Read 180 program, and to have another teacher provide I.S. with individual instruction during those times through Leveled Literacy, a program that focuses particularly on phonics and phonetic awareness. (R. 270, 2653). This arrangement continued for the rest of I.S.'s 4th grade year.

I.S.'s mother also requested an Independent Educational Evaluation to determine I.S.'s abilities and recommend appropriate services, so the School retained Sue Grisko to prepare a

report. (R. 484, 579). Ms. Grisko met with I.S. in May 2010 and administered a series of tests, and she submitted her report on August 7, 2010. Ms. Grisko concluded that I.S. had deficits in the areas of phonological processing (processing the sounds of a word) and rapid naming (the efficient retrieval of phonological information from long-term or permanent memory). (R. 488–89, 497). Termed a "double deficit," this combination of difficulties made it "much more difficult for [I.S.] to learn to read." (R. 497). Ms. Grisko opined that "[t]eaching [I.S.] to read must take priority over his expected 5th grade curriculum," and that "[h]is full day should be devoted to literacy instruction to close his ever-widening gap." (R. 497). She recommended "a minimum of two hours per day for decoding based reading instruction," plus another hour to address his rapid naming deficit, with the rest of his school day "includ[ing] instruction to practice and use his newly learned skills to automaticity." (R. 497). Ms. Grisko further believed that "[f]luency at the passage level should not be stressed until [I.S.'s] passage decoding accuracy is above 95%," because practicing fluency when a student is not yet reading words accurately only promotes "faster guessing" of words, which "is an extremely difficult habit to break." (R. 498). Ms. Grisko recommended that I.S. attend a private school designed to teach a specialized literacy curriculum in order to receive this level of instruction. (R. 498).

On August 20, 2010, the first day of I.S.'s 5th grade, the CCC convened for a meeting to discuss Ms. Grisko's report. Ms. Grisko attended the meeting and presented her report, and she specifically recommended that I.S. be placed at Hyde Park Day School, a private school where he could receive special education services from reading specialists throughout the school day. (R. 302). The School's staff discussed the report with Ms. Grisko, and decided that they would like another opinion before proposing the services I.S. would receive in his next IEP. (R. 302). However, the Parents were not content for I.S. to continue receiving reading instruction from the

School in a manner that they believed to be ineffectual and possibly even counterproductive. (R. 302–03). Thus, they decided that they would pull I.S. from school each day in the afternoon, when he would otherwise receive this instruction, and teach him at home themselves.

Following this meeting, the School commissioned a report from Rachelle Wright to assess I.S.'s needs and make a recommendation as to his placement and special education services. Ms. Wright did not evaluate or observe I.S. herself, but reviewed several other recent assessments, including Ms. Grisko's, to complete her report. (R. 524, 2337). Ms. Wright's report generally identified the same deficiencies as Ms. Grisko's, but her recommendations were not nearly as broad. She believed that I.S. should receive instruction through "an alternate core program for at least 90-120 minutes per day," and that this instruction should address "all components of literacy," including "phonemic awareness, phonics, fluency, vocabulary, comprehension, and written language," as opposed to focusing exclusively on phonemic awareness and phonics, as recommended by Ms. Grisko. (R. 533). Ms. Wright suggested several alternate core programs through which to implement this instruction. Her third recommendation was Read 180, but she noted that "Read 180 is not as strong as the other two programs in the area of phonemic awareness," so she recommended that, if used, it be supplemented by other programs in that area. (R. 536).

The School first shared this report with the Parents at the next CCC meeting on October 7, 2010. Ms. Grisko attended the meeting at the expense of the Parents, but Ms. Wright was not present to discuss her report. (R. 338). Nonetheless, the School presented Ms. Wright's report and the results of other assessments they conducted, and its staff members discussed I.S.'s progress. The parties then discussed what services I.S. should receive as part of his IEP. The School proposed 150 minutes of reading instruction, composed of 90 minutes through Read 180

and 60 minutes of reinforcement and supplementation through other methodologies. (R. 341). The Parents rejected any use of the Read 180 program, though, and indicated that they would continue removing I.S. from school in the afternoon and teaching him with a phonics course that they purchased at Ms. Grisko's recommendation. The parties grew no closer to an agreement, so the meeting concluded with the understanding that the Parents would continue to remove I.S. from school, and the School would submit its final proposed IEP for the Parents' consideration.

The IEP that the School ultimately proposed on October 18, 2010, which would cover the remainder of I.S.'s 5th grade and the beginning of his 6th grade years, called for I.S. to remain in the public school, and to receive 150 minutes of daily reading instruction in the resource room, in addition to 1 hour of daily instructional support in his general education classroom. (R. 334–35). The IEP did not specify which programs or methodologies the School would use for I.S.'s reading instruction, although the meeting notes contained in the IEP reflect that the School intended to continue using the Read 180 program for at least a portion of his instruction. (R. 341).

Unsatisfied with this proposal, the Parents continued removing I.S. from school in the afternoon and teaching him in reading at home, and they formally requested a due process hearing through the Indiana Department of Education pursuant to the IDEA. (R. 8). The Parents contended that the IEPs for I.S.'s 2nd, 3rd, and 4th grade years were both substantively and procedurally flawed, and that the IEP proposed for his 5th grade year was substantively inadequate as well. They further contended that these flaws deprived I.S. of the free appropriate public education to which he was entitled under the IDEA, and that he was entitled to compensatory educational services as a result. The Indiana Department of Education appointed

an independent hearing officer, who, in consultation with the parties, framed the issues as follows:

> 1.      Whether Respondents [the School] have offered the student an individualized education program (IEP) designed to confer meaningful educational benefit and meet his unique needs.
>
> 2.      Whether the IEP proposed by Respondents at the October 7, 2010 case conference committee (CCC) meeting offered the student an education program appropriate to meet the student's needs.
>
> 3.      Whether Respondents reviewed an[d] revised the student's IEP in accordance with 511 IAC 7-42-9 and 511 IAC 7-42-5 [Indiana's administrative regulations implementing the IDEA].
>
> 4.      Whether Respondent failed in any duty to invite and fund the attendance of Susan Grisko, an independent evaluator, to the CCC meeting of October 7, 2010 so as to violate 511 IAC 7-42-3(b)(4). If so, are the parents entitled to reimbursement for the cost to them of the evaluator's attendance at that conference.
>
> . . . .
>
> 9.      Whether, considering substantive and procedural violations found to exist, the student has been denied a free appropriate public education (FAPE). If so, to what compensatory education is the student entitled.

(R. 160–61).[3]

After efforts to resolve the matter amicably failed, the parties held a four-day hearing in

March 2011. The hearing officer heard testimony from fifteen different witnesses, including

several of I.S.'s teachers and other of the School's staff members, both of his parents, Ms.

Grisko, Ms. Wright, and the principal of Hyde Park Day School (to which I.S. had applied, but

had not yet been admitted). The parties also submitted well over one thousand pages of exhibits,

---

[3] There were four other issues in dispute at the hearing, two of which the hearing officer struck on the School's motion because they were duplicative of issues that had already been resolved through separate complaints, and two of which the hearing officer resolved in the School's favor. Neither party objects as to those four issues, so the Court does not address them.

plus hundreds of pages of case law for the hearing officer's reference. The hearing officer subsequently issued her decision on April 4, 2011. (R. 157).

The hearing officer first found that based on the two-year statute of limitations and the fact that the Parents filed the due process hearing request in the fall of I.S.'s 5th grade year, the inquiry was limited to the IEPs developed in the fall of I.S.'s 3rd, 4th, and 5th grade years. (R. 172 ¶ C 0.2). As to the 3rd grade IEP, she found that it was substantively adequate, as the amount of instruction it included and the Wilson program used to implement it were reasonably calculated to confer educational benefit. (R. 172 ¶ C 1.1). But, she found that the 3rd grade IEP was procedurally flawed, as the School did not review and revise it as required since the School kept little data on I.S.'s progress and used nearly identical goals from the previous IEP. (R. 174 ¶ C 3.1). However, because his teachers had informally ascertained his actual level of performance and provided appropriate instruction despite the deficient goals and lack of meaningful progress monitoring data, the hearing officer found that the School did not deny I.S. a free appropriate public education. (R. 175 ¶ C 9.1).

As to the 4th grade IEP, the hearing officer found that "[t]he Read 180 program used in 4th grade did not target the student's severe deficit in decoding and was not reasonably calculated to confer educational benefit." (R. 173 ¶ C 1.3). Specifically, she found that the Read 180 program "focuses on fluency skills prior to the development of accurate decoding," which "promotes 'faster guessing,'" a very difficult habit for students to break, and that Read 180 "is not appropriate for this student due to his poor decoding skills." (R. 164 ¶ F 1.14). Due to this methodology, I.S.'s "reading progress in the 4th grade was, at best, trivial." (R. 173 ¶ C 1.2). Accordingly, the hearing officer found that this IEP "was not reasonably designed to confer

educational benefit and was not appropriate to meet [I.S.'s] unique needs," and that it therefore denied I.S. a free appropriate public education. (R. 173 ¶ C 1.3, 176 ¶ C 9.2).

As to the 5th grade IEP, the hearing officer found that the 150 minutes of reading instruction was appropriate and, "insofar as time is concerned, reasonably balances the student[']s need for direct instruction and his need to participate in the general education curriculum." (R. 165 ¶ F 2.1). She also noted, though, that the School intended to devote 90 minutes of that time to the Read 180 program, which "is weak in the area of phonemic awareness and decoding skills, which are [I.S.'s] most critical need." (R. 165 ¶ F 2.3). She disapproved of this approach, finding that I.S. "needs to spend the majority of his direct instructional time in his area of most critical need, decoding," using Orton-Gillingham-based methodologies. (R. 165 ¶ F 2.4). She therefore found that the "proposed IEP was not appropriate with regards to the balance of methodologies actually proposed" by the School. (R. 173 ¶ C 2.2). Nevertheless, she found that the "proposed methodologies were not expressly a part of the student's proposed IEP," so she concluded that "[t]he proposed IEP, as written, appropriately addressed the student's needs," and substantively complied with the IDEA. (R. 173 ¶ C 2.1).

Having found that only the 4th grade IEP denied I.S. a free appropriate public education, the hearing officer then turned to the appropriate compensation for that period. With little discussion, though, she concluded that the 5th grade IEP provided enough instruction "both to address [I.S.'s] current needs and to provide compensatory education," apparently meaning that it would both provide an adequate ongoing education and make up for the deficiencies of the previous year. (R. 176 ¶ C 9.3). Accordingly, she declined to award any additional compensatory education services. The hearing officer concluded her decision by ordering the School to implement the proposed 5th grade IEP as written, but she also ordered the School to provide

Orton-Gillingham-based instruction for at least 90 of his 150 instructional minutes per day, which the School had not proposed. She further directed the School not to take any time away from I.S.'s science, social studies, or math classes to receive these services, and ordered this instruction to continue through his 6th grade year.

The Parents timely appealed the hearing officer's decision by filing a complaint in this Court on May 4, 2011. [DE 1]. The Parents contend that the School denied I.S. a free appropriate public education from the 2nd through the 5th grades, and that he is entitled to compensatory education services to make up for those periods. They also assert that the hearing officer erred in finding that the 5th grade IEP provided enough instructional time to encompass compensatory education for the denial of a free appropriate public education in the 4th grade. Thus, they seek additional compensation for this entire period. Further, after filing the complaint in this matter, the Parents were able to place I.S. at the Hyde Park Day School, where he attended the 6th, 7th, and 8th grades. They therefore also seek reimbursement for his attendance at that school based on the School's alleged ongoing failure to provide I.S. with a free appropriate public education.

## II. STANDARD OF REVIEW

The typical summary judgment standard of review does not apply in cases brought under the IDEA. *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 611 (7th Cir. 2004). Rather, the IDEA provides that a court reviewing the outcome of a due process hearing: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The party challenging the outcome of the administrative proceedings bears the burden of proof. *M.B. ex rel. Berns v. Hamilton Southeastern Schs.*, 668 F.3d 851, 860 (7th Cir. 2011). On issues of law, the Court reviews the hearing officer's decision *de novo*. *Id.* On issues

of fact, however, the Court accords "due weight" to the decision of the hearing officer.

*Forrestville*, 375 F.3d at 612. The amount of weight that is due varies depending on whether the parties submit evidence to the Court that was not before the hearing officer:

> At one end of the continuum, where the district court does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative order only if it is "strongly convinced that the order is erroneous." *School Dist. v. Z.S.*, 295 F.3d 671, 675 (7th Cir.2002) (quotation omitted). This level of review is akin to the standards of clear error or substantial evidence. *Id.* The more that the district court relies on new evidence, however, the less it should defer to the administrative decision: "[j]udicial review is more searching the greater the amount (weighted by significance) of the evidence that the court has but the agency did not have." *Id.*

*Id.* Here, the parties submitted limited evidence outside of the administrative record, but that evidence pertains only to I.S.'s progress after leaving the School, which has little relevance to any issues that the hearing officer reached. Accordingly, except as otherwise noted, the Court reviews the hearing officer's decision under a substantial evidence standard.

### III. DISCUSSION

The Parents assert that the School violated I.S.'s rights under the Individuals with Disabilities in Education Act, 20 U.S.C. § 1410 *et seq.* Under the IDEA, "'a state that accepts federal funding to educate disabled children must provide such children with an education that is free, public, and appropriate.'" *Berns*, 668 F.3d at 860 (quoting *Forrestville*, 375 F.3d at 606); 20 U.S.C. § 1412(a)(1). The school district, however, is not required to provide the "best possible education," or to maximize a student's potential. *Berns*, 668 F.3d at 860; *Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 905 (7th Cir. 2002). Rather, the IDEA only requires a school to provide a "basic floor of opportunity," meaning "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 201 (1982).

The IDEA implements these aims largely through the extensive procedural requirements involved in developing a student's Individualized Educational Program, but the IEP must meet certain substantive standards as well. *Id.* at 182, 206–07. Thus, there are two questions a court must consider in evaluating a claim under the IDEA: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* at 206–07. If so, then the school has satisfied its obligations. *Id.*

Here, the Parents object to the 2nd, 3rd, 4th, and 5th grade IEPs, so the Court first considers whether the School met its obligations under the IDEA as to each IEP. Finding that it did not as to two different time periods, the Court then considers the appropriate remedies.

## A. The School's Compliance with the IDEA

The IEPs in question encompass portions of I.S.'s 2nd through 6th grade school years. These issues generally fall into five separate time periods, and the Court considers each in turn. First, however, the Court notes that the Parents argued below that the School violated the IDEA by declining to pay Ms. Grisko's fee for attending the October 2010 CCC meeting. The hearing officer found against the Parents on this issue, concluding that the School had no duty to invite and fund the attendance of Ms. Grisko at that meeting. (R. 175 ¶ C 4.1). Though the Parents indicate that they are appealing this issue [DE 95 p. 2 n.1], they provided no argument on this point and did not respond to the School's argument in support of the hearing officer's decision. Accordingly, the Court finds that the Parents waived any objection to this conclusion, and affirms the hearing officer's decision on this issue.

### 1. 2nd Grade

The Parents argue that the School denied I.S. a free appropriate public education in the 2nd grade (the 2007–08 school year) by failing to adequately review and revise his IEP. The

hearing officer did not address this school year, as she found that only the 3rd, 4th, and 5th grade IEPs fell within the two-year statute of limitations, since the Parents filed the request for a due process hearing in the fall of I.S.'s 5th grade year. (R. 172 ¶ C 0.2). On appeal, the Parents have not addressed the hearing officer's conclusion as to the statute of limitations. In addition, the School expressly argued in its briefs that this school year was outside the statute of limitations, but the Parents did not respond to that argument. Thus, they have failed to discharge their burden as the party challenging the hearing officer's decision on this issue, and they have forfeited any argument against the statute of limitations, so the Court affirms the hearing officer's decision as to the 2nd grade IEP.

## 2. 3rd Grade

The Parents next argue that I.S.'s 3rd grade IEP was procedurally flawed and that it denied him a free appropriate public education. The hearing officer concluded that the School committed procedural violations in formulating I.S.'s 3rd grade IEP by failing to review and revise his goals based on measurements of his progress. (R. 174 ¶ C 3.1). But, she found that these violations did not deny I.S. an appropriate education because his teachers had informally ascertained his levels of performance and provided instruction consistent with his needs. (*Id.* ¶ F 3.16, ¶ C 9.1). The parties vigorously contest both the existence of procedural violations and whether those violations denied I.S. a free appropriate public education. The Court finds that substantial evidence supported the hearing officer's finding that any procedural violations did not result in substantive harm to I.S. or the Parents, meaning they did not deny him a free appropriate public education. Therefore, the Court affirms the decision on that ground and need not address whether the procedural violations actually occurred.

Though the IDEA attaches substantial importance to its procedural requirements, "'[p]rocedural flaws do not require a finding of a denial of a free appropriate public education.'"

*Hjortness ex rel. Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1065 (7th Cir. 2007); *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 276 (7th Cir. 2007). Rather, procedural flaws will have denied a student a free appropriate public education only where they "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *Hjortness*, 507 F.3d at 1065 ("[P]rocedural inadequacies that result in the loss of educational opportunity result in the denial of a free appropriate education.").

The Parents argue that I.S.'s lack of progress demonstrates that he suffered substantive harm from the procedural flaws, but this argument fails for several reasons. First, this argument is largely non-responsive to the hearing officer's findings. The hearing officer did not premise her conclusion on a finding that I.S. made progress, she based it on her finding that the deficient goals did not negatively impact I.S.'s instruction. By not adequately confronting this finding, the Parents fail to discharge their burden to overturn the hearing officer's decision. Relatedly, the Parents fail to draw the requisite connection between the procedural defects and I.S.'s education. To warrant compensation under the IDEA, procedural flaws must cause a lack of progress, not merely coincide with it, *Hjortness*, 507 F.3d at 1065, and while the Parents dwell on I.S.'s lack of progress, they make little effort to tie that lack of progress to any procedural defects. They argue only briefly that the failure to revise I.S.'s 3rd grade IEP resulted in a loss of educational benefit because it rendered its goals meaningless. But the Parents also have to show that the meaningless goals somehow translated into the instruction I.S. received, and they have not done so. The hearing officer found that I.S.'s teachers appropriately assessed his levels of performance

and provided instruction consistent with his needs, so despite the recycled goals, I.S. was not receiving recycled instruction.[4] (R. 175 ¶ F 3.16, ¶ C 9.1). Additionally, I.S. received instruction through the Parents' preferred methodology during his 3rd grade year, and the Parents do not suggest that I.S. should have received different or additional instruction, nor have they indicated any way in which I.S.'s education would have been different had the IEP contained adequate goals. Thus, this argument does not provide a basis to overturn the hearing officer's decision.

Further, to the extent I.S.'s progress is relevant to this issue in the first place, the Parents overreach in relying on a spoliation argument to demonstrate the lack of progress. The Parents argue that the School spoliated evidence because it kept little progress monitoring data and because certain documents "were either lost or never maintained," so the hearing officer should have drawn an adverse inference against the School.[5] [DE 95 p. 19]. However, to the extent the Parents argue that the School spoliated evidence by failing to create documents in the first place, this fundamentally misconceives the nature of spoliation. Spoliation is "'the intentional destruction, mutilation, alteration, or concealment of evidence, usually a document.'" *Cahoon v. Cummings*, 734 N.E.2d 535, 545 (Ind. 2000) (quoting *Black's Law Dictionary* 1409 (7th ed. 1999)). A party does not commit spoliation by failing to create evidence, only by destroying, altering, or concealing it. *See id.*

In addition, to the extent the Parents are referring to documents that once existed, the record simply does not support a conclusion that any documents were lost under circumstances

---

[4] To the extent the lack of adequate goals and progress monitoring data interfered with the School's ability to craft subsequent IEPs, the harm would have been realized during those subsequent periods, not this one, and thus would not establish that I.S. was denied a free appropriate public education during this period. Because the Court finds that the subsequent IEPs were deficient on other grounds, it need not address this potential consequence.

[5] The Parents initially argued that spoliation should have shifted the burden of proof to the School, but they later withdrew that argument and asserted that an adverse inference should have applied.

that would justify an adverse inference due to spoliation. "[C]ourts have found a spoliation sanction to be proper only where a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008). In addition, even when documents are lost after a party has a duty to preserve them, not all losses of evidence constitute spoliation and justify an adverse inference. *See Howard Regional Health Sys. v. Gordon*, 952 N.E.2d 182, 189–90 (Ind. 2011). Rather, a court must consider the degree of a party's culpability and the extent of the resulting prejudice, to determine which among a broad range of remedies is appropriate.

Here, the Parents primarily focus on a binder that I.S.'s teachers kept with their notes on his progress, which was lost at some point prior to the due process hearing. It appears that it was lost around the end of I.S.'s 4th grade year, when his teacher, Ms. Horn, left the School for a new job. Ms. Horn apparently left the binder at the school, but because I.S. did not receive direct reading instruction when he returned for 5th grade, no one retrieved the binder and it was lost. (R. 1683–85). However, the Parents did not request the due process hearing until the fall of I.S.'s 5th grade year, and Ms. Grisko's report and the CCC meetings that led to the due process hearing request all took place after the binder was lost. Thus, the Court cannot conclude that this evidence was lost or destroyed after the prospect of litigation became imminent. The circumstances of the loss—a teacher's departure from the school—also suggest a low degree of culpability. Finally, there is limited prejudice to the Parents. Ms. Horn read from the binder during a meeting with the Parents and during the April 2010 CCC meeting, so they likely had a general idea of the information it contained. The information in the binder was also translated into the progress notes that the teachers entered into the computer program, so while the information in the binder may have been different in form and in detail from the information in

the computer program, it was likely similar in the degree of progress it indicated I.S. was

making. The Parents also had a chance to examine the teachers during the due process hearing.

Therefore, the Parents fall well short of establishing that the hearing officer erred by not drawing

an adverse inference based on spoliation. Accordingly, the Court affirms the hearing officer's

conclusion that the School did not deny I.S. a free appropriate public education in the 3rd grade.

### 3. 4th Grade

The hearing officer found in the Parents' favor relative to I.S.'s 4th grade education.

Thus, while the Parents take issue with the remedies the hearing officer awarded, they do not ask

the Court to alter the determination that the School failed to provide I.S. with a free appropriate

public education. Though it did not address the issue in its initial brief, the School argues that

I.S. actually received an appropriate education in 4th grade. However, it has not provided a

sufficient basis to overturn the hearing officer's conclusion, so the Court finds that the School

failed to provide I.S. with a free appropriate public education in the 4th grade.

I.S.'s 4th grade IEP called for him to receive 90 minutes of direct reading instruction

each day.[6] (R. 253). However, the School provided this instruction through the Read 180

program, of which the hearing officer was highly critical. (R. 247, 577). She found that while

I.S.'s most significant area of need was in decoding words (sounding them out), the Read 180

program "did not provide significant remediation" in that area, and left him "without intensive,

systematic phonics instruction for one school year." (R. 164–65, 171). Worse yet, the hearing

officer found that the Read 180 program was actually damaging to I.S.'s reading skills. Because

of his difficulty sounding out words, I.S. developed a tendency to guess words based on their

---

[6] The 4th grade IEP did not formally take effect until November 5, 2009. However, the School began implementing the Read 180 system sometime before that (though it is unclear exactly when), so the Court considers this period as beginning with the introduction of the Read 180 system in the 4th grade.

beginning sounds, which is a very difficult habit to break. However, Read 180 focuses on fluency skills prior to developing accurate decoding skills, which promotes "faster guessing" and reinforces this detrimental habit. (R. 164). Accordingly, the hearing officer found that this methodology was "not appropriate" for I.S., and that because the IEP was implemented through this methodology, it was "not reasonably designed to confer educational benefit and was not appropriate [to] meet [I.S.'s] unique needs." (R. 164, 173).

These conclusions are well-supported by the record, and the School does not directly challenge them on appeal. Any challenge on this front would likely be frivolous, as the Court owes the highest degree of deference to the hearing officer on questions of methodology. *Rowley*, 458 U.S. at 207 ("[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for . . . choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child."). Instead, rather than directly defending the appropriateness of the Read 180 program, the School argues that I.S. received a free appropriate public education because he still made some progress during his 4th grade year.

This argument fails for several reasons. First, the evidence that the School cites to demonstrate I.S.'s progress is far too limited to upset the hearing officer's decision. The School cites several progress reports intermittently recorded by I.S.'s teacher during the 4th grade, but these demonstrate little, if any, progress. The charts indicate that I.S. progressed in certain categories from "Emerging" ("In early stages of development") at the beginning of the year, to "Developing" ("Progress is evident"), one increment up, at the end of the year. (R. 380, 382). This offers limited insight into his actual progress, but this progress appears rather modest anyway. The written notes add little information, and focus more on I.S.'s attitude and effort

than his educational progress. (R. 377–90). Given the amount of testimony specifically addressing the Read 180 program and why it was not appropriate given I.S.'s particular needs, and the hearing officer's finding that I.S. made "minimal" progress, this limited evidence does not justify overturning the hearing officer's conclusion.

In addition, evidence of I.S.'s progress is largely irrelevant given the hearing officer's finding that I.S.'s limited success was "a result of his relative strength as an auditory learner and the efforts of his parents in assisting him with his homework, and not [the School's] educational interventions." (R. 176; *see also* R. 162 (noting the ways in which the Parents "supplement the student's general education instruction" at home)). This finding, which the School does not address on appeal, undercuts any argument that I.S.'s progress was attributable to the IEP or the School. To the contrary, I.S.'s progress, if any, would simply show that he overcame a deficient IEP, not that the School provided him an adequate one. Therefore, the Court affirms the hearing officer's conclusion that the School denied I.S. a free appropriate public education in 4th grade.

### 4. 5th Grade until the Hearing Officer's Decision

The Parents next argue that the hearing officer erred by finding that I.S.'s 5th grade IEP was substantively adequate. The 5th grade IEP called for I.S. to receive 150 minutes of direct instruction on reading each day, and the hearing officer found that this amount of time was appropriate. (R. 173). However, the hearing officer found that the School intended to devote 90 minutes of that time to the Read 180 program, which "did not target the student's most critical need, decoding skills." (R. 165, 173). Accordingly, she found that "[t]he major methodology proposed (Read 180) is not appropriate to address the student's most significant need," and that "[t]he proposed IEP was not appropriate with regards to the balance of methodologies actually proposed by [the School]." (R. 173–74). The hearing officer's findings as to the inappropriateness of the Read 180 methodology and of the balance of methodologies proposed

are well-supported by the record and have not been challenged on appeal, so the Court accepts those findings.

However, the hearing officer attributed these findings no weight in assessing the overall adequacy of the 5th grade IEP. Instead, she found that "[t]he proposed methodologies were not expressly a part of the student's proposed IEP," so "[t]he proposed IEP, as written, appropriately addressed the student's needs." (R. 173)). She therefore concluded that "[t]he IEP proposed for the 2010 school year, insofar as it entitles the student to 150 minutes per day direct instruction, and 60 minutes per day collaboration with the general education classroom, is appropriate" and provided I.S. with a free appropriate public education. (R. 176).

These conclusions cannot be reconciled, and the Parents' arguments on this point are well-taken. The hearing officer essentially found that even though the School intended to implement the IEP through an inappropriate methodology, the IEP was adequate because it failed to specify that methodology. (R. 173 (concluding that the IEP was appropriate "as written" and "insofar as" it includes certain amounts of instructional time)). It is undisputed, though, that the School intended to use the Read 180 program for the majority of I.S.'s direct reading instruction, and the hearing officer found that this balance of methodologies was inappropriate for I.S. Thus, had I.S. received the instruction called for by the IEP, that instruction would have been inappropriate, and I.S. would not have received a free appropriate public education. That the IEP itself did not require this deficient methodology does not change that fact. *See D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 566 (3d Cir. 2010) (holding that an IEP was inappropriate where the hearing officer found that the student needed to receive particular services in order to receive meaningful educational benefit, but the IEP failed to incorporate those services). Of course, I.S. did not actually receive that instruction, as his Parents decided to remove him from school and

teach him at home instead of leaving him to receive ineffectual instruction through the Read 180 program. However, the IEP still called for this instructional time, and the hearing officer accepted the IEP based on its inclusion of this instructional time. Thus, the fact that I.S. did not attend school for this instruction does alter the adequacy of the IEP or the fact that I.S. would have received an inappropriate education if he had remained in school.

Furthermore, as a matter of law, the fact that the IEP left open the possibility that I.S. would receive inappropriate instruction means that it was substantively deficient. A child's IEP must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. Thus, it "must be tailored to the unique needs of that particular child," *Heather S. v. Wisconsin*, 125 F.3d 1045, 1055 (7th Cir. 1997), and must be "likely to produce progress, not regression or trivial educational advancement." *Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 615 (7th Cir. 2004). Because it failed to specify an appropriate methodology or exclude the Read 180 program, which would have produced no benefit, I.S.'s 5th grade IEP was not tailored to his unique needs or likely to produce progress instead of regression.

That is not to say that an IEP must always specify a methodology or foreclose the use of any inadequate methodologies. In most cases, the use of one methodology over another will not be the difference between whether a student does or does not receive an appropriate education. *E.g.*, *Rowley*, 458 U.S. at 209–10. And even where some potential methodology may be inappropriate, it may not even be among the possibilities for the instruction at issue. Here, however, the hearing officer expressly found that the Read 180 program was inappropriate for I.S. and that its use deprived him of a free appropriate public education in the 4th grade. Further, there was a distinct possibility I.S. would receive that instruction for this year, as he had received

it in the 4th grade, the School proposed its use in the 5th grade, and the Parents had no reason to believe that would not be the case. In fact, the hearing officer recognized this by ordering the School to use a different methodology instead. Accordingly, if, as the hearing officer found, the IEP was indifferent as to which methodology was used, it cannot have been reasonably calculated to provide educational benefit when one of the potential methodologies would have been likely to produce regression or no progress.

The Parents provide an apt analogy on this point. If a person contracts a bacterial infection, an appropriate treatment plan might call for the person to take medication. However, if it is just as likely that the medication would be aspirin instead of an antibiotic, the treatment plan would not be reasonably calculated to cure the infection—one medication would cure it, while the other would have no effect at all and would permit it to spread. The same is true here. The 150 minutes of direct reading instruction may be appropriate as a framework, but if that time could be used for either of two methodologies, one of which would provide an educational benefit and one of which would not, the IEP cannot be said to be reasonably calculated to provide a benefit. Thus, the IEP's failure to specify a methodology or exclude the Read 180 program means that it was substantively inadequate. The Court therefore overturns the hearing officer's conclusion on this issue, and finds that the School denied I.S. a free appropriate public education for this time period.

### 5. After the Hearing Officer's Decision

The Parents finally argue that I.S.'s 5th grade IEP was inadequate even after the hearing officer's decision, which cured the only objection they had to that IEP by ordering the School to implement Orton-Gillingham methodology. Because this was the time period in which the Parents placed I.S. in a private school, they contend that this entitles them to reimbursement for I.S.'s private school tuition. *See Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of*

*Mass.*, 471 U.S. 359, 370 (1985). In arguing this point, the Parents do not object to the substance of the IEP as it existed after the hearing officer's decision; the only argument they raise on appeal relative to the 5th grade IEP was that it relied on the Read 180 methodology, but the hearing officer substituted that methodology with Orton-Gillingham instruction. Rather, the Parents only argue that the hearing officer was not permitted to modify the IEP in this regard. Because I.S. would not have received a free appropriate public education for the rest of the school year and into his 6th grade year absent this modification, the Parents argue that they were entitled to place him in a private school for 6th grade and seek reimbursement from the School.

This argument is misplaced, however, because the hearing officer issued her decision curing the IEP well before the Parents placed I.S. in a private school, so her modification of the IEP did not improperly interfere with the Parents' placement decision. The Parents' argument relies on a line of cases arising out of *Burlington*, in which the Supreme Court held that when a school fails to provide an acceptable education, parents can unilaterally place a student in an appropriate private school and then seek reimbursement for the tuition through the IDEA hearing process. *Burlington*, 471 U.S. at 370. This conclusion flows from the fact that due process hearings and the judicial review process can take substantial periods of time, during which a student who ultimately prevails will have received an inadequate education. *Id. Burlington* thus allows parents to act proactively in ensuring that their child receives an appropriate education, without waiving their child's right to a *free* appropriate public education. *Id.* However, parents who choose this alternative bear the risk that a hearing officer or court will find that the school complied with the IDEA, in which case the parents will receive no reimbursement for the cost of the private school. *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993).

Because parents must typically make these decisions prospectively, before the IEP at issue is implemented, courts generally evaluate the adequacy of the IEP based only on the information in the IEP itself:

> In order for this system to function properly, parents must have sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision. At the time the parents must choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on, and therefore the adequacy of the IEP itself creates considerable reliance interests for the parents. . . . By requiring school districts to put their efforts into creating adequate IEPs at the outset, IDEA prevents a school district from effecting this type of "bait and switch," even if the baiting is done unintentionally. A school district cannot rehabilitate a deficient IEP after the fact.

*R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 185–86 (2d Cir. 2012) (also collecting cases). Thus, a hearing officer or court cannot later reform an IEP in order to hold that, because a modified version of the IEP would have been appropriate, the parents were not justified in removing their child from the public school.

However, this reliance interest is entirely absent where, as here, the hearing officer issues an order modifying the IEP months prior to the parents' decision to send their child to a private school. In that event, the parents know prior to making their decision that their child's education at the public school will include the modifications ordered by the hearing officer, so there is no bait and switch. The parents have the benefit of considering the modified IEP just the same as they could consider the IEP itself if they had to make the choice prior to the hearing officer's decision. If the parents consider the modified IEP inadequate, they can still appeal the decision and place their child in a private school in the meantime. But in doing so, they assume the risk that the court will find that the education their child would have received had he attended public school—meaning under the IEP as modified by the hearing officer's order—was adequate.

Here, the effective dates of the IEP at issue were November 4, 2010 to November 4, 2011, which ran from the fall of I.S.'s 5th grade year to the fall of his 6th grade year. The Parents

requested a due process hearing on October 22, 2010, but they were unable to enroll I.S. in a private school for the 5th grade, so they continued taking him out of school in the afternoon and home-schooling him in reading. As of the due process hearing in March 2011, I.S. had applied to the Hyde Park Day School, but he had not yet been admitted. The hearing officer issued her decision on April 4, 2011, and she ordered the School to provide Orton-Gillingham-based instruction for at least 90 minutes per day. She also directed the School to continue this instruction through I.S.'s 6th grade year. However, the Parents continued home-schooling I.S. in reading for the rest of his 5th grade year, and I.S. did not begin attending Hyde Park Day School until the beginning of the 6th grade.

Under these circumstances, the Parents had no legitimate reliance interest on the un-modified IEP at the time they enrolled I.S. in the private school. Based on the hearing officer's decision, the Parents knew for certain that if I.S. attended the public school, he would receive their preferred method of reading instruction. The hearing officer's decision was not merely extrinsic evidence showing what education I.S. might have received had he returned to school, as was at issue in *R.E.* 694 F.3d at 186–87 ("For example, if an IEP states that a specific teaching method will be used to instruct a student, the school district may introduce testimony at the subsequent hearing to describe that teaching method and explain why it was appropriate for the student. The district, however, may not introduce testimony that a different teaching method, not mentioned in the IEP, would have been used."). Rather, it guaranteed the Parents in writing that their son would receive an education that the hearing officer found to be appropriate, through a methodology the Parents supported. Because the Parents do not challenge the adequacy of that education on appeal, they cannot claim that they were entitled to reimbursement for enrolling I.S. in a private school because the IEP that existed prior to the hearing officer's decision was

inadequate. Therefore, the Court finds that the School's violation of the IDEA ceased as of the deadline for it to implement the hearing officer's order, May 4, 2011, and that I.S. is not entitled to compensation past that point.

## B.     The Appropriate Remedy

Having determined that the School failed to provide I.S. with a free appropriate public education for two of these time periods, the Court must decide what relief to award. Upon finding that a school violated the IDEA, the Court may "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "Under this provision, 'equitable considerations are relevant in fashioning relief,' and the court enjoys 'broad discretion' in so doing." *Florence*, 510 U.S. at 16 (quoting *Burlington*, 471 U.S. at 369, 374). The Seventh Circuit has not directly addressed how to craft compensatory awards for violations of the IDEA, but the generally accepted standard is that the compensation should "provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid*, 401 F.3d at 523–24. In other words, "[c]ompensatory awards should place children in the position they would have been in but for the violation of the Act." *Draper*, 518 F.3d at 1289.

Here, the hearing officer found that the School denied I.S. a free appropriate public education in the 4th grade and she made a determination as to the appropriate compensation for that period, so the first question is whether that compensation was indeed appropriate. The hearing officer concluded that the 5th grade IEP already contained enough instruction to both provide I.S. with a free appropriate public education and compensate him for his inadequate 4th grade education, so she awarded no compensation beyond what was already included in the IEP. The Parents contest this conclusion, arguing that this instruction cannot be considered

27

compensatory if I.S. would have received it regardless of whether he prevailed on any of his claims. The Court agrees.

Compensatory awards must go beyond the education a student would otherwise receive so as to make up for the deficient education the student had to previously endure, so it is difficult to consider an award compensatory where it gives a student nothing they would not have received in the first place. *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 525 (D.C. Cir. 2005) ("[W]hereas ordinary IEPs need only provide 'some benefit,' compensatory awards must do more—they must *compensate*"). I.S. would have received 150 minutes of direct reading instruction even if the hearing officer completely rejected his claims and found that the School never denied him a free appropriate public education. The only change the hearing officer made to the IEP was to substitute Read 180 with Orton-Gillingham, but she did not characterize that as compensatory.[7] To the contrary, based on her findings as to those methodologies, that substitution was necessary for the IEP to provide I.S. with the requisite educational benefit. Compensation is meant to place a student in the position they would have been in but for the violation of the Act, and but for the violation of the Act as to the 4th grade, I.S. would have received this exact same education in the 5th grade *and* would have received an adequate education during the 4th grade. Thus, unless the hearing officer found that I.S. suffered no harm from the violation during the 4th grade (which she did not, and which would be inconsistent with

---

[7] She also ordered, without discussion, that this instruction continue through I.S.'s 6th grade. (R. 176). However, the fact that she did not reference the duration of this instruction in any of her findings or conclusions as to the appropriateness of this compensation further underscores the lack of a reviewable basis for this conclusion, as discussed below. Further, there is no reason to believe the School would not have proposed at least 150 minutes per day of direct instruction in the next IEP anyway, (the IEP it proposed for I.S.'s 8th grade offered 175 minutes of direct instruction daily [DE 97-1 p.42]), in which case the hearing officer's order that the IEP extend through the 6th grade would confer no additional benefit.

her other findings), this cannot have put I.S. in the place he would have been absent the violation.

There could be situations in which an IEP may adequately incorporate compensation, such as where a school concedes that it failed to provide a free appropriate public education, so it adds compensatory education into an IEP as a conciliatory measure in the hope of avoiding a due process hearing. Here, however, the School did not—and does not—concede that it ever denied I.S. a free appropriate public education. Whatever the reason the School chose to offer 150 minutes of direct reading instruction when its expert recommended at least 90 to 120 minutes, that reason certainly was not that it had denied I.S. a free appropriate public education in the 4th grade. There are some hints in the record that the School provided this "additional" time because the Parents began taking I.S. out of school in the afternoon at the beginning of 5th grade, meaning he was not receiving reading instruction from the School. However, the 5th grade IEP was proposed only about six weeks into the school year, and it is highly unlikely that the amount of time the School added to the IEP to compensate I.S. for six weeks of no reading instruction (at least not from the School) could be enough to compensate I.S. for an entire year of instruction that was not only inappropriate, but likely counterproductive as well. It is much more likely that the School did not add any additional time to compensate for past violations, but intended the added time to be part of I.S.'s baseline education, in order to avoid a finding that the IEP itself failed to provide a free appropriate public education.

In addition, the hearing officer's cursory treatment of this issue makes it difficult to assess the validity of her conclusions. Though she found that the direct instructional time was sufficient "for both ongoing instruction and compensatory education," it is unclear how much of that time she considered to be for ongoing versus compensatory education. The hearing officer

found that the 150 minutes of direct reading instruction was "in excess of the 90-120 minutes proposed by reading specialist Rachelle Wright," but she never expressly adopted Ms. Wright's opinion or found that only 90 or 120 minutes of direct reading instruction would be sufficient. (R. 165 ¶ F 2.1; 173 ¶ C 2.1). Further, Ms. Wright recommended "*at least*" 90-120 minutes, which is consistent with the 150 minutes proposed by the School, and also testified that I.S. "*needed* [an] additional 30 minutes" beyond the Read 180 program (which takes 90 minutes daily) because Read 180 does not adequately address phonics and phonemic awareness. (R. 901, 2343–44 (emphases added)). Thus, the IEP encompassed at most 30 minutes of compensatory instruction each day, but may have provided even less. By not expressly indicating what constituted I.S.'s baseline education versus his compensatory education, the hearing officer did not provide enough information for the Court to meaningfully review this conclusion.[8] Therefore, the Court finds that the compensation awarded by the hearing officer was not appropriate, and vacates this aspect of the hearing officer's decision.

That leaves the Court to fashion appropriate relief for these periods *de novo*. The first issue to address in that regard is what form that relief should take. Notably, the parties only suggest one form of compensation—reimbursement for I.S.'s attendance at Hyde Park Day School. While the School contests the appropriateness of this placement, it does not suggest any alternatives, so as long as the Court determines that this placement is appropriate, it need not determine if any other form of relief would be more appropriate. *See Bd. of Educ. of*

---

[8] It is also difficult to square the hearing officer's conclusion with the finding she made in assessing the adequacy of the baseline education provided by the 5th grade IEP, that: "insofar as time is concerned," the 150 minutes of direct reading instruction "reasonably balances the student[']s need for direct instruction and his need to participate in the general education curriculum." (R. 165 ¶ F 2.1). If the 150 minutes of direct reading instruction strikes a reasonable balance before considering compensation, how can that same balance be appropriate when adding in the need to compensate for a whole year without meaningful direct reading instruction?

*Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ.*, 41 F.3d 1162, 1168 (7th Cir. 1994) ("Since the court was presented with only one option, it was not required to locate another school that would satisfy the least restrictive alternative requirement based on the entire pool of schools available, but rather was required simply to determine whether that one available choice would provide an appropriate education for [the student].").

The Court notes at the outset that reimbursement for I.S.'s attendance at a private school is a permissible form of compensation even though I.S. is not entitled to reimbursement under the *Burlington* framework. *Burlington*, 471 U.S. at 370 (holding that parents can be entitled to reimbursement of private school tuition where "a private placement desired by the parents was proper under the Act and . . . an IEP calling for placement in a public school was inappropriate"). Though the IEP in effect at the time I.S. left the public school was adequate, so *Burlington* does not apply, the School failed to provide I.S. with a free appropriate public education for the greater part of two years, so he is still entitled to compensation for those periods. This compensation can include "[r]elief in the form of reimbursement for out-of-pocket educational expenses" even when the *Burlington* factors do not apply. *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 597 (7th Cir. 2006); *Bd. of Educ. of LaGrange Sch. Dist. No. 105 v. Illinois State Bd. of Educ.*, 184 F.3d 912, 917–18 (7th Cir. 1999) (holding that, as an alternative to reimbursement under the *Burlington* framework, "reimbursement to parents for the cost of private school is an equitable remedy which may be imposed in the discretion of the district court"). Such an award is also permissible even where the public school is capable of providing an appropriate education going forward. *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1284–86 (11th Cir. 2008) (holding that "the Act does not foreclose a compensatory award of

placement in a private school" even if the public school "could prospectively provide an appropriate education program").

Since reimbursement is a permissible form of compensation in these circumstances, the question is whether Hyde Park Day School in particular is an appropriate placement for I.S. In arguing that it is not, the School primarily asserts that it is inappropriate because it is not the least restrictive environment. As the School correctly notes, the IDEA "give[s] strong preference to mainstreaming students with disabilities," meaning educating them with their non-disabled peers to the maximum extent possible. *Monticello Sch. Dist. No. 25 v. George L. ex rel. Brock L.*, 102 F.3d 895, 906 (7th Cir. 1996). However, the School overstates the importance of this consideration in the context of compensatory education or reimbursement. The least restrictive environment requirement "was developed in response to school districts which were reluctant to integrate mentally impaired children and their non-disabled peers." *Murphysboro*, 41 F.3d at 1168. This requirement primarily acts as a limit on the schools, meaning that a school cannot propose an IEP that places a student in an environment that is more restrictive than necessary. *Id.*; *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836–37 (2d Cir. 2014) (noting that the least restrictive environment requirement "was aimed at preventing *schools* from segregating disabled students from the general student body," and was not meant "to restrict *parental* options when the public schools fail to comply with the requirements of the IDEA").

As with a number of other requirements with which schools must comply in proposing IEPs, the least restrictive environment requirement does not apply with equal force to parents' decisions to place their children in private schools when the public schools have violated the IDEA. *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 770 (6th Cir. 2001) ("[P]arents who have not been treated properly under the IDEA and who unilaterally withdraw

their child from public school will commonly place their child in a private school that specializes in teaching children with disabilities. We would vitiate the right of parental placement recognized in *Burlington* and *Florence County* were we to find that such private school placements automatically violated the IDEA's mainstreaming requirement."); *R.E.*, 694 F.3d at 187 n.3 ("[R]eview of the private placement" where a school has violated the IDEA "is more informal than review of the original IEP: a private placement need not meet the IDEA requirement for a [free appropriate public education] and is not subject to the same mainstreaming requirement as a public placement."); *see Florence*, 510 U.S. at 13–15 (holding that a private school need not comply with certain standards that would apply to a public school in order to qualify for reimbursement); *Murphysboro*, 41 F.3d at 1168 (holding that the least restrictive environment requirement "is applicable only if the IEP meets IDEA minimums").

The private school need only provide an "appropriate" or "proper" education, and while the restrictiveness of the private school's environment may factor into that inquiry, it is not a standalone requirement in the compensation or reimbursement context. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247, (2009) (stating that a private school need only be "appropriate" to qualify for reimbursement); *Scarsdale*, 744 F.3d at 836–37 (holding that a student's least restrictive environment "remains a consideration that bears upon a parent's choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate," but that "parents . . . may not be subject to the same mainstreaming . . . requirements as a school board").

Therefore, the Court must determine as a more general matter whether the Hyde Park Day School was an appropriate placement for I.S., and the Parents have amply discharged their burden of establishing that it was. The Hyde Park Day School specializes in teaching students

such as I.S. with average to above-average intelligence but with moderate to severe learning disabilities, and the majority of its curriculum is designed to remediate language-based learning disabilities. It provides reading instruction through the Orton-Gillingham methodology, and the same teachers who teach reading also teach the other subjects, meaning they can implement and reinforce the reading instruction throughout all of the content areas. Further, with no more than five students to a teacher at any point, the students receive direct and personalized instruction for the whole day. These services are consistent with the recommendations of Ms. Grisko and Ms. Wright, who recommended that I.S. receive intensive phonics instruction and that he be immersed in a program designed to remediate his difficulties in reading and writing, and with the hearing officer's findings. (R. 497–99, 533–34). In addition, the school provides a social work curriculum that focuses on the "intangibles of having a learning disability," such as learning to be a self-advocate, to use environmental resources, to set goals, and to persevere when tasks are difficult. (R. 1971–72). The school also has one tablet computer for every student, and utilizes a range of technological resources. Finally, the school has a proven track record of educating students with disabilities and helping them transition back to their home schools.

These factors demonstrate that Hyde Park Day School constitutes an "appropriate" private placement for I.S. The school's entire mission is to educate students like I.S., and it is well-equipped to do so. In addition, the low student-to-teacher ratios, the integration of reading instruction and reinforcement throughout the school day, and the social work curriculum tailored to students with language disabilities, are among the services that Hyde Park Day School provides that the School either cannot or does not, at least not to the same extent, which further justifies a private placement. The Court acknowledges that Hyde Park Day School is a rather restrictive environment, as I.S. does not receive any instruction with his non-disabled peers.

However, it is not excessively so, as I.S. still receives appropriate instruction across the content areas in addition to instruction to remediate his learning disability, and the instruction and resources he receives are aimed at eventually reintegrating him into his home school environment. I.S. is also able to participate in after-school sports at his home school.

The School finally argues that Hyde Park Day School is inappropriate because I.S. has not made meaningful progress there. The parties have submitted competing expert reports on this issue, reaching opposite conclusions as to whether I.S. is making progress and as to whether Hyde Park Day School is appropriate for him. The Court need not enter this fray, however, because even the School's expert declined to attribute her findings as to I.S.'s progress to the appropriateness of his placement—while she criticized Hyde Park Day School in some respects, she also noted that I.S.'s limited progress over this time "[wa]s due to the significance of his learning disability and not to lack of appropriate interventions," and she acknowledged that Hyde Park Day School provides I.S. with the sorts of accommodations she recommended, as well. (DE 97-1 p. 14, DE 100-1 p. 3). Thus, even if the Court were to accept this expert's opinion that I.S. had not made meaningful progress, that would not lead to the conclusion that Hyde Park Day School is not an appropriate placement for I.S. Accordingly, based on the nature and extent of services offered by Hyde Park Day School, the court finds that it is an appropriate placement for I.S.

The last question, then, is how much of I.S.'s stay at Hyde Park Day School should be reimbursed as compensation for the School's IEDA violations. The Parents argue that the Court should award day-for-day compensation and order the School to reimburse them for I.S.'s tuition at Hyde Park Day School for as many years as he was denied an appropriate education by the School. Though the Third Circuit has arguably embraced this type of mechanical approach, it is

in the minority in doing so. *Compare Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 249 (3d Cir.2009) (stating that a "disabled child is entitled to compensatory education for a period equal to the period of deprivation"), *with Reid*, 401 F.3d at 523–24 (disapproving of a "cookie-cutter approach"), *and Petrina W. v. City of Chicago Public Sch. Dist. 299*, No. 08-cv-3183, 2009 WL 5066651, at *4 (N.D. Ill. Dec. 10, 2009) (collecting cases to the same effect). The majority of courts have adopted a more nuanced approach, holding that compensatory awards must "rely on individualized assessments" to provide the educational benefits that likely would have accrued to that particular student from the special education services the school district should have supplied in the first place. *Reid*, 401 F.3d at 523–24. While the Seventh Circuit has not directly addressed this issue, two district courts in this circuit have adopted the qualitative, individualized approach espoused by *Reid*. *T.G. ex rel. T.G. v. Midland Sch. Dist. 7*, 848 F. Supp. 2d 902, 924 (C.D. Ill. 2012); *Petrina W.*, 2009 WL 5066651, at *4. The Court agrees that this qualitative approach is more consistent with the IDEA's directive to individually tailor a student's education to meet their unique needs, and with the equitable standards that govern compensatory awards, so the Court adopts that standard.

Therefore, I.S. is entitled to an amount of compensation that is reasonably calculated to provide the educational benefits that likely would have accrued from the special education services the School should have provided in the first place. However, the current record does not permit the Court to adequately conduct this inquiry. As to I.S.'s 4th grade, the hearing officer found that I.S. was "without intensive, systematic phonics instruction for one school year," and that his progress that year was, "at best, trivial." (R. 171 ¶ F 9.1, 173 ¶ C 1.2). However, it is not clear from the record what degree of progress would have been achieved during that time through adequate instruction. It is also even less clear how much additional instruction I.S.

would have needed to make up that difference, *see Reid*, 401 F.3d at 524 (noting that while "[s]ome students may require only short, intensive compensatory programs targeted at specific problems or deficiencies[,] [o]thers may need extended programs, perhaps even exceeding hour-for-hour replacement of time spent without [a free appropriate public education]"), or how the value of that additional instruction translates to reimbursement of his cost to attend Hyde Park Day School (which is also absent from the record). As to I.S.'s 5th grade, the hearing officer made no findings in this regard, as she found that the proposed IEP was appropriate. However, this Court found to the contrary, and despite the instruction he received at home during this time, I.S. likely suffered some deficit during this year compared to the instruction he should have received through the School.[9] The extent of that deficit is unclear, though, as is the amount of additional services I.S. would require to make up that difference.

Accordingly, the Court believes that the most appropriate remedy is to remand this matter to the Indiana Department of Education to determine, in light of this discussion, the amount of compensation that I.S. should receive. *See Reid*, 401 F.3d at 526 (noting that "in light of the absence of pertinent findings in the administrative record . . . the district court may determine that the 'appropriate' relief is a remand to the hearing officer for further proceedings"); *Petrina W.*, 2009 WL 5066651, at *5 (remanding to the hearing officer to determine the appropriate amount of compensation). Although the Court could direct the parties to supplement the record and decide the matter itself, an independent hearing officer will have greater relative expertise in this area, and it is appropriate to leave these issues to the administrative agency to decide in the first instance. On remand, the hearing officer should determine the amount of compensation

---

[9] Neither party has suggested that the compensation for this period should consist of reimbursement for the Parents' home-schooling costs, so the Court does not consider that possibility.

required to put I.S. in the position he would have been in had he received a free appropriate public education during the time periods at issue, meaning from the time the School began using the Read 180 program in I.S.'s 4th grade, to the deadline for the School to comply with the hearing officer's order. That compensation should presumptively be in the form of reimbursement for an equivalent amount of services from Hyde Park Day School.

## IV. CONCLUSION

The Court GRANTS both parties' motions for summary judgment in part, and DENIES both motions in part. The Court REMANDS this matter to the Indiana Department of Education to determine the amount of reimbursement I.S. should receive for his attendance at Hyde Park Day School, as compensation for the School's failure to provide a free appropriate public education from the time it began using the Read 180 program in I.S.'s 4th grade year to the deadline for the School to comply with the hearing officer's order in the spring of his 5th grade year. The Clerk of the Court is DIRECTED to enter judgment in favor of the Plaintiff.

SO ORDERED.

ENTERED:  September 10, 2014

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court